## LAMSON CO. v. E. T. SLATTERY CO.

### (District Court, D. Massachusetts. March 17, 1924.)

### No. 1831.

1. **Patents ⬤⟹328—968,576, claims 3, 4, 5, for improvement in open vacuum cash carrier system, held not infringed.**

　　Libby patent No. 968,576, claims 3, 4, 5, for improvement in valve-closing mechanism in open vacuum cash carrier system, *held* not infringed.

2. **Patents ⬤⟹328—968,576, claims 1 and 2, for valve mechanism of open vacuum cash carrier system, held valid and infringed.**

　　Libby patent No. 968,576, claims 1 and 2, for valve mechanism in open vacuum cash carrier systems preventing the needless suction of air when tube is not in use, *held* valid and infringed.

In Equity. Suit by the Lamson Company against the E. T. Slattery Company. Decree for plaintiff.

Robert Cushman and Roberts, Roberts & Cushman, all of Boston, Mass., for plaintiff.

George A. Sweetser, of Boston, Mass., and W. P. Preble, of New York City, for defendant.

MORTON, District Judge. This is a suit for the infringement of patent No. 968,576 to Charles R. Libby, dated August 30, 1910, for improvement in pneumatic dispatch tube apparatus. The bill alleges that all of the claims are infringed. The defense principally relied upon is noninfringement.

The Libby patent relates to vacuum cash carrier systems which are in common use in large shops and in many other places. Such systems, of the type here involved, consist essentially of a tube open at one end to the air and connected at the other end to an exhausting pump, and of cylindrical carriers adapted to fit like a piston in the tube. When such carrier is inserted at the open end of the tube, it is pushed forward by the pressure of the atmosphere behind it against the partial vacuum in front of it. At the discharging point a fixture, which it is unnecessary to describe, is interposed in the tube so that the carrier is shot out into the proper place.

When such systems were first installed the intake end of the tube was left open, and a continuous current of air to the full capacity of the tube was constantly sucked through it. As the tubes were two inches or more in diameter, this required a large amount of air to be handled, and the continuous expenditure, in large installations, of about one-half horse power per tube. As any given tube would be in

actual use only a small part of the time, there was a great waste of power.

Libby solved this difficulty by interposing in the suction part of the tube, nearer the exhausting machinery than the carrier would go, a valve which normally closed it, but which opened automatically whenever a carrier was introduced into the tube. This valve prevented the needless suction of air when the tube was not in use. Such an arrangement saves, on the testimony before me, rather more than half the power otherwise required. The underlying idea of the Libby patent, viz. a valve in the tube which is normally closed thereby preventing the wasteful suction of air and which is opened by the momentary change of vacuum or air current caused by the introduction of a carrier, and closes after the carrier has left the system, was old, being clearly shown in the Bavier & Hawks patent, dated September 18, 1900. That patent, however, relates to a closed system, and could not be transferred to an open one without basic, and perhaps inventive, rearrangement. Open systems have advantages over closed ones; and the Libby patent shows the first tube valve actuated pneumatically by the introduction of a carrier adapted for use in such systems. To this extent it is a pioneer patent. The same result had been secured in other ways by electrical apparatus.

The Libby mechanism consists essentially of a clapper valve hinged at its lower edge and normally held in a closed position by a spring. When shut it completely closes the tube. It is controlled by a diaphragm placed in a closed chamber on the suction side of it. A small by-pass, the capacity of which can be accurately regulated, connects the part of the chamber behind the diaphragm with the tube. Normally the pressure on both sides of the diaphragm is equalized through this by-pass, being the same as that in the tube; and the spring keeps the valve closed. The action of the diaphragm is controlled by a small valve (which I shall refer to as the controlling valve) which, when opened, allows the full pressure of the atmosphere to act on the back of the diaphragm. This pressure is sufficient to overcome both the spring which holds the principal valve shut and the reduced air pressure in the tube, and to open the valve, thereby permitting a full draft of air through the tube.

The mechanism by which the controlling valve is actuated consists of a second diaphragm set into a pipe by-pass which opens into the tube above and below the principal valve. This by-pass brings upon the back of the controller diaphragm the pressure in the tube, i. e., about one pound of vacuum. The other side of this diaphragm is open to the atmosphere except when the principal valve is open. In order to prevent the pressure of the atmosphere from forcing the diaphragm against the vacuum, thereby keeping the controlling valve always open, the stem of the controlling valve is pressed shut by an adjusting spring, the tension of which is just sufficient to overcome the difference in pressure on the two sides of the diaphragm and to keep the controlling valve seated. This diaphragm and the controlling valve which it actuates may be regarded as a balanced valve, having on one side the pressure of the atmosphere, and on the other a re-

duced atmospheric pressure supplemented by the pressure of the spring. The exhausting machinery is constantly drawing a slight amount of air through the conveyor tube via the pipe by-pass.

The introduction of a carrier into the mouth of the tube stops the inflow of air. This causes an increase of vacuum in the tube and by-pass, and on the diaphragm of the controlling valve; it upsets the balance of that valve and allows the pressure of the atmosphere to force the valve open. The opening of the controlling valve causes, as has been described, the opening of the principal valve and allows a full current of air to be drawn through the transmitting tube thereby moving the carrier.

The closing mechanism: Once open, the principal valve would, if there were no further mechanism, stay open, either permanently or at any rate an unnecessarily long time. In order to avoid this, closing mechanism is provided. It consists of a two-way valve on the atmospheric side of the controlling valve diaphragm. The opening of the principal valve actuates this two-way valve, cuts off the connection between this diaphragm and the atmosphere, and opens that side of it into the tube. The result is that on both sides of this diaphragm the partial vacuum of the tube is at once established, and the diaphragm becomes balanced. This allows the spring of the controlling valve to come into play and close that valve. When that has occurred the air behind the diaphragm of the principal valve is gradually drawn out into the tube through the by-pass until the pressure on both sides of it becomes balanced, i. e., the pressure of the tube; then the spring closes this valve, and the cycle is complete. The time which is required to equalize the pressure through the by-pass can be regulated by adjusting the opening of the by-pass. In this way the length of time which the principal valve remains open can be governed. This adjustment is made for each valve so as to keep it open long enough to allow the carrier to complete its flight. It is to be observed that the valve is timed arbitrarily, and that discharge of the carrier does not actuate mechanism to close it.

Coming to the defendant's device: The defendant's device has a principal valve which, although of different design, accomplishes the same result as that of the patent, viz. it almost closes the tube near the exhaust end. It differs from the plaintiff's valve in that it never closes completely, but always allows a certain amount of air to be drawn through between the valve and its seat. This valve is actuated, as in the Libby device, by a diaphragm, one side of which always carries the partial vacuum of the tube, and the other side of which can be opened to the atmosphere by a controlling valve. There is a by-pass around the diaphragm which, when the controlling valve is shut, equalizes the pressure on both sides of it with that in the tube, and a spring which, when the pressure is equalized, keeps the principal valve closed except when the spring is overcome by air-pressure on the diaphragm, as in the Libby device. The valve is opened by admitting atmospheric pressure behind its diaphragm, by means of the controlling valve like the valve of the patent.

The controlling valve of the defendant's device is actuated by a diaphragm, one side of which is always open to the atmosphere, and

the other side normally to the partial vacuum of the tube. In principle it is like that of the Libby patent. The inequality of pressure is normally balanced by the weight of the valve (which hangs vertically), which takes the place of the corresponding spring in the plaintiff's device. The introduction of a carrier increases the vacuum in the tube and thereby upsets the balance on the diaphragm of the controlling valve and permits the atmospheric pressure to lift and open it, thereby admitting air behind the diaphragm of the principal valve, as in the plaintiff's device. It is clear, I think, that the defendant's valve operates upon the same principle as the plaintiff's, and through similar or equivalent mechanism.

The closing mechanism of the defendant's valve is, however, radically different. There is no third valve closing the air opening to the controller diaphragm; the under side of the diaphragm is as above stated, always open to atmospheric pressure. A vane projects into the tube. It is pivoted, and, outside of the tube, actuates a valve which opens the upper side of the controller diaphragm to the atmosphere. This valve is normally closed. As long as a carrier is in the system the comparatively small amount of air which is drawn through with it does not affect this vane. But after the carrier has been discharged and the full blast of air is drawn through the tube it moves this vane and opens the valve controlled by it. Opening this valve establishes full atmospheric pressure on both sides of the controller diaphragm, which thereupon ceases to hold up the controlling valve, and that valve immediately closes. The closing of that valve is followed by an equalization of pressure on both sides of the diaphragm of the principal valve through the by-pass, which in turn is followed by the closing of the valve through the pressure of its spring, as in the plaintiff's device.

[1] This closing mechanism differs both in principle and construction from that of the patent; and this difference is so clear that extended discussion of it seems unnecessary. In the plaintiff's valve there is no vane nor vane valve, nor anything which corresponds to them. It operates by establishing the partial vacuum of the tube on both sides of the controller diaphragm by mechanism which is operated directly by the principal valve and has no counterpart in the defendant's structure; while in the defendant's valve the controller is closed by bringing full atmospheric pressure on both sides of its diaphragm through mechanism which is not found at all in the patent and which is set in motion by the exit of the carrier. It is true that on a short length of carrier tubing the defendant's valve will close if the vane valve is rendered inoperative. This is because in a short length of tubing there is practically no drop from atmospheric pressure between the open end of the tube and the point at which the upper side of the controlling valve is connected with the tube. But the testimony is—and I can readily believe it—that in a long tube this would not be true. I hardly need observe that the closing mechanism referred to in the claims is that described in the patent, giving, of course, due regard to the doctrine of equivalents. So far as the claims in suit include closing mechanism, they are not, in my opinion, infringed by the defendant's structure. This obviously applies to claims

4 and 5. As to claim 3: The last element of it, "means for maintaining said maximum flow of air only during the transmission of carriers through said transit tube," refers to the closing mechanism described in the patent, and covers only that or equivalent mechanism, which, as I have said, is not found in the defendant's structure. This claim is not infringed.

[2] This reduces the case to the question whether the defendant's valve and its opening mechanism infringe claims 1 and 2. As to claim 1: Of the several elements constituting this claim, all are clearly found in the defendant's structure except "a normally closed air valve located in said exhaust tube," and "a connection between said exhaust tube and said transit tube for normally permitting a minimum flow of air through said transit tube." As to the first of these: In the patent the valve closes tight and the minimum flow is drawn through a pipe by-pass opening into the tube above and below the valve. The diaphragm chamber of the controlling valve is located on this by-pass and the minimum of current of air is drawn through it. In the defendant's structure there is no by-pass. The minimum current is maintained through the tube by leaving the principal valve partially open at all times. As I have said, the operative principle is identical in the two valves; in each the purpose of the principal valve is to stop the wasteful flow of air, and each valve performs that function. It seems to me that the valve is "closed" within the meaning of the patent when it does that.

As to the other element referred to: Whether "a connection between said exhaust tube and said transit tube for normally permitting a minimum flow of air through the said transit tube," within the meaning of the patent, is found in the defendant's structure, is more doubtful. If the patent were not, as to the principle involved, a pioneer one, I should incline to say that the closed valve and the pipe by-pass around it, which is required for the operation of other parts of the valve, were not essentially the same as the defendant's unseated valve. But the opening in the valve does make a "connection between the exhaust tube and the transit tube" in the language of the claim, and, considering that we are dealing with the first patent of its kind and principle, I am of opinion that the unseated valve permitting the continuous minimum current is the equivalent of the closed valve and the by-pass. The other elements of this claim are so plainly present in the defendant's structure that no discussion of them is required. This claim is infringed.

As to claim 2: For reasons which are I think sufficiently evident from the foregoing discussion, I am of opinion that this claim also is infringed by the defendant's structure.

As to the validity of these claims: It is to be borne in mind that we are dealing with open vacuum systems and with pneumatically operated valves adapted to open on the insertion of a carrier, without other power than that derived from the tube. Valves electrically actuated and valves designed for closed systems do not go far as anticipations. The Bavier & Hawkes patent, which has been referred to, is the only one which required discussion; and it by no means anticipates these claims. The circular dated September, 1906, containing

a photographic cut of the defendant's valve in an installation of about 20 tubes in the store of Quackenbush Company, of Patterson, N. J., is not pleaded or relied upon as invalidating the patent or as being an anticipation of the patent. Counsel for the defendant said, referring to this matter: "It is not an anticipation at all."

Decree for plaintiff upon the first and second claims, and for an accounting in usual form.